CHEYENNE SALEENA STARK, A MINOR, AND CODY BRANDON STARK, A MINOR, BY
THEIR GUARDIAN AD LITEM, NICOLE JACOBSEN v. FORD MOTOR COMPANY, A
DELAWARE CORPORATION

No. 313PA10

(Filed 13 April 2012)

**Products Liability— product alteration or modification
defense—not required to be party to action**

The Court of Appeals erred by concluding the General
Assembly limited the use of the product alteration or modifica-
tion defense to those occasions when the one who altered or
modified the product was a party to the action at the time of trial.
The defense found in N.C.G.S. § 99B-3 applies not only when the
one who modifies or alters the product is a party to the action
concerning the product, but also whenever anyone other than the
manufacturer or seller modifies or alters the product and the
remaining statutory requirements are met. There was sufficient
evidence presented from which the jury could conclude that the
accident victim's father modified the seatbelt for his child in the
automobile. The case was remanded to the Court of Appeals for
additional proceedings.

Justice **HUDSON** concurring in part and dissenting in part.

Justice **TIMMONS-GOODSON** joining in opinion concurring in
part and dissenting in part.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous
decision of the Court of Appeals, 204 N.C. App. 1, 693 S.E.2d 253
(2010), reversing a judgment dismissing plaintiffs' complaint entered
on 15 May 2007 and vacating an order awarding costs to defendant
entered on 28 April 2008, both entered by Judge Forrest D. Bridges in
Superior Court, Mecklenburg County, and remanding for entry of
judgment in favor of Cheyenne Stark and for a trial on the issue of
damages. Heard in the Supreme Court on 3 May 2011.

*Wyrick Robbins Yates & Ponton LLP, by K. Edward Greene and
Tobias S. Hampson; and Gilbert and Ollanik, P.C., by James L.
Gilbert, pro hac vice, for plaintiff-appellees.*

*Kilpatrick Townsend & Stockton LLP, by Adam H. Charnes,
Richard J. Keshian, and Richard D. Dietz; and Smith,
Anderson, Blount, Dorsett, Mitchell & Jernigan L.L.P., by Kirk
G. Warner and Christopher R. Kiger, for defendant-appellant.*

**STARK v. FORD MOTOR CO.**

[365 N.C. 468 (2012)]

*Edward Eldred, Attorney at Law, PLLC, for The Covenant With North Carolina's Children and KidsAndCars.org, amici curiae.*

*Yates, McLamb & Weyher, LLP, by Dan J. McLamb, for National Association of Manufacturers, Chamber of Commerce of the United States of America, American Tort Reform Association, and Property Casualty Insurers Association of America, amici curiae.*

*Michael W. Patrick, for North Carolina Advocates for Justice, amicus curiae.*

*Poyner Spruill LLP, by Steven B. Epstein, for North Carolina Association of Defense Attorneys and North Carolina Chamber, amici curiae.*

*I. Beverly Lake Jr., pro se, and for former members of the North Carolina General Assembly H. Parks Helms, Robert B. Jordan, III, I. Beverly Lake Jr., and H. Martin Lancaster, amici curiae.*

*Womble Carlyle Sandridge & Rice, PLLC, by Burley B. Mitchell, Jr., William F. Womble, Jr., James R. Morgan, Jr., and John E. Pueschel, for Product Liability Advisory Council, amicus curiae.*

NEWBY, Justice.

This case presents the question whether the product alteration or modification defense provided to manufacturers and sellers in products liability actions by section 99B-3 of our General Statutes applies only if the one who altered or modified the product is a party to the litigation at the time of trial.[1] By its plain language, section 99B-3 protects manufacturers and sellers from liability for injury proximately caused by a modification or alteration made by anyone else to their product without their consent or instruction. The General Assembly did not limit the use of this defense to those occasions when the one who alters or modifies the product is a party *to the action* at the time of trial. As the Court of Appeals concluded otherwise, we reverse that decision and remand this case to that court for additional proceedings.

Tonya Stark was driving her husband to work and her children to school in a 1998 Ford Taurus on the morning of 28 April 2003. Tonya began that day between 5:00 and 5:30 a.m. by waking up and bathing

---

1. While other issues were raised by the parties and passed upon by the Court of Appeals, our resolution of this question obviates the need to address them.

**STARK v. FORD MOTOR CO.**

[365 N.C. 468 (2012)]

three of her children. While Tonya was busy with the children, Gordon Stark, her husband, prepared for a day of work. When the Starks were ready to go, Gordon put their sleeping daughter Cheyenne in the rear seat of the Taurus, directly behind the driver's seat, and then he sat in the front passenger seat. Tonya secured their son Cory in the middle rear seat before she got into the driver's seat. Their son Cody seated himself in the rear seat of the Taurus, directly behind Gordon. The plan was to take Gordon to work at Husqvarna, where he needed to arrive between 7:00 and 7:30 a.m., and then travel to Kannapolis to have the children at their school by 8:20 a.m.

At some point that morning, Gordon told Tonya that he needed to stop at a convenience store before work. Tonya entered the parking lot of a store at the corner of The Plaza and Eastway in Charlotte, North Carolina. Gordon went into the store to make some purchases, but returned to the car when he realized he did not have his wallet. Gordon told Tonya to take him back home so he could get his wallet and return to complete his purchases before they continued on to work and school. Tonya backed out of her parking space and attempted to leave the convenience store parking lot via a pass-through, which would allow the Starks to return to the house more quickly. She remembered almost immediately, however, that the pass-through had been closed. Tonya then made a U-turn and entered the adjacent parking lot of a Bojangles restaurant. The car began to accelerate rapidly, proceeding through several empty parking spaces. Gordon and Tonya struggled over the steering wheel as the Starks continued through the lot. Their trip came to an abrupt end when the Taurus went up and over a small curbed island containing mulch and monkey grass and then slammed into the concrete base of a light pole while moving at twenty-six miles per hour. At no point during these events did Tonya apply the Taurus's brakes.

The Starks suffered numerous injuries in the crash. Gordon looked at his wife immediately after the impact, and he thought she was dead. Cory suffered a cut to his eye area through which his "eye-ball" was visible "even though his eye was closed," as well as a concussion and a neck injury. Gordon shattered his elbow and left wrist and broke his left shoulder. Gordon's doctors informed him that his left hand might need to be amputated due to the severity of the fracture. Cody and Cheyenne had the most serious injuries. Cody experienced a tear in his liver, several superficial tears on the surface of his colon, a hematoma underneath his bowel, and a perforation of his small bowel causing leakage into his stomach. Cody required

emergency lifesaving surgery as a result. Cheyenne sustained bruises on her abdomen, an abrasion on her forehead, a tear on the tip of her tongue, and an injury to her spinal cord. Though Cheyenne was able to walk after the crash, her condition deteriorated later that day, and she became paralyzed.

Through their Guardian ad Litem, Cheyenne and Cody (plaintiffs) sued Ford Motor Company (Ford) after the crash. Plaintiffs acknowledged that Ford did not cause the wreck, but claimed that the Taurus's seat belt system caused their enhanced, or more serious, injuries. Cody and Cheyenne contended that the seat belts did not fit them properly and did not hold them in place during the incident. They alleged these deficiencies in the design of the Taurus caused Cody's abdominal injuries and Cheyenne's paralysis. Ford asserted that Cody and Cheyenne suffered these injuries because of the seriousness of the collision and a failure to use the Taurus—and specifically its safety equipment—as it was designed and as Ford instructed. Ford contended the Taurus and its seat belt system are reasonably designed and safe when used properly.

Plaintiffs presented evidence in support of their claims. They offered testimony from Joseph Burton, M.D., an expert in forensic pathology, biomechanics, and occupant kinematics. He testified that seat belts are designed to "couple" a passenger to a vehicle in a crash, allowing the passenger to slow down with the car. When the passenger and vehicle are slowing together, the passenger can rely in part on the crush zone of the vehicle to absorb energy. In contrast, an unbelted passenger continues to move at the same speed the car was traveling before impact until the passenger hits something that causes him to slow down. In that case the passenger does not get the benefit of the vehicle's crush zone. Dr. Burton stated that a vehicle's seat belt system should couple the passenger to the vehicle with both a shoulder belt that comes over the passenger's shoulder and then goes down "along the rib cage" without covering the "soft parts of [the] abdomen," and a lap belt that rests over the bones of a passenger's pelvis.

Dr. Burton explained to the jury that the seat belt system in the Taurus did not perform in this manner for Cody and Cheyenne. He opined that a defect in the seat belt system allowed excess belt webbing to come off the spool, creating slack in the belt. This slack prevented the Taurus's belt system from coupling Cody and Cheyenne to the vehicle as it should have. The shoulder belt slipped off Cody's and Cheyenne's shoulders. As a result of that slippage Cody sustained

bruising from his lap belt over his hips, some type of abrasion "to the right side of his chest" from his shoulder belt, and numerous internal injuries in his abdominal area. Cheyenne suffered a bruise above her navel, a bruise on her lower abdomen from her lap belt, an abrasion on her forehead, a cut on the end of her tongue, and "some changes" in the lumbar area of her spine. Her shoulder belt also acted as a fulcrum, damaging her spinal cord at level T3, which is in her upper back. Dr. Burton informed the jury that he believes that before the crash, both Cody and Cheyenne were properly belted, with their shoulder belts in front of them. He posited that Cheyenne's smaller size may be the reason for her permanent injury.

Dr. Burton also testified that the collision was not responsible for Cheyenne's and Cody's enhanced injuries. He explained that plaintiffs' enhanced injuries are not what he would expect from the type of collision in which they were involved. Instead, he characterized their injuries as "mechanical injuries," which "are caused by . . . the way the[ir] bodies are interacting with the structure." Such injuries, he said, are not related to the speed of the car before impact and may result from a vehicle that is traveling twenty miles per hour or sixty miles per hour when a collision occurs.

Ford asserted in response that this was a serious collision in which the Taurus was misused. Joe Kent, Ford's accident reconstruction and accident analysis expert, informed the jury that the impact of the crash was roughly the same as would have been achieved by dropping the Taurus from the fourth floor of a building. Dr. Murray Mackay, Ford's expert in seat belt occupant interaction, biomechanics, injury mechanism, and occupant kinematics, testified that Cheyenne's seat belt system had been modified by placing the shoulder belt behind her back. Cheyenne had no bruising or other markings on her body consistent with the shoulder belt having been in front of her at the time of the collision, though she did have bruises from her lap belt. Dr. Mackay also stated that Cheyenne's seat belt had markings and other characteristics consistent with its being behind her back. Dr. Mackay explained to the jury that, in his opinion, Cheyenne's paralysis resulted from her lap belt compressing her abdomen, which, combined with the absence of a shoulder belt, caused her chest to move toward the floor, which stretched and bent her spinal cord until her chest ultimately came into contact with her thigh. Pamela Oviatt, Ford's expert in vehicle and occupant restraint design performance, also testified that Cheyenne's shoulder belt exhibited markings consistent with its being behind her back at the

time of the collision. Ford presented evidence indicating that Cheyenne had on prior occasions placed the shoulder portion of the belt behind her back and that on the date in question, Gordon did the same thing.

At the close of evidence plaintiffs argued that Ford's defense under section 99B-3 should not be submitted to the jury, and they sought a directed verdict in their favor on that issue. Plaintiffs asserted that section 99B-3 allows manufacturers to be relieved of liability only when an alteration or modification by another party to the litigation proximately causes injury. Plaintiffs maintained that because neither Gordon nor Tonya was then a party to the action, Ford could not use this statutory defense to avoid liability for any injury proximately caused by a modification made by either of them. The trial court rejected plaintiffs' argument.

At the conclusion of the five week trial, the court instructed the jury on the section 99B-3 defense. The court explained that if it reached this issue, the jury must decide whether

the enhanced injuries to Cheyenne Stark [were] proximately caused by an alteration or modification made to the product by someone—were the enhanced injuries to Cheyenne Stark caused by an alteration or a modification of the 1998 Ford product.

On this issue the burden of proof is on the defendant. This means that the defendant must prove by the greater weight of the evidence four things:

First, that the 1998 Ford Taurus was altered or modified. A product has been altered or modified if there has been a change in its design or use from that—if there has been a change in its use from that which was originally designed, tested, or intended by the manufacturer. An alteration—let me say that again.

A product has been altered or modified if there has been a change in its use from that originally designed, tested, or intended by the manufacturer.

Second, that someone other than the defendant made the alteration or modification after the Ford Taurus left the control of the defendant.

Third, that the defendant did not expressly consent to that alteration or modification, or that such alteration or modification was not in accordance with the defendant's instruction and specifications.

Fourth, that such alteration or modification was a proximate cause of injuries to Cheyenne Stark. Of course, we are talking about enhanced injuries. You now know what proximate cause is. I have said that several times. It's a cause in which in a natural and continuous sequence produces a person's injury and a cause in which a reasonable and prudent person could have foreseen would probably produce that injury or such similar injurious result. Keep in mind there may be more than one proximate cause of an injury.

In this case the defendant Ford contends and the plaintiff denies that there was an alteration or modification of the product after it left the defendant's control; namely, that Gordon and Tanya [sic] failed to properly secure and restrain Cheyenne Stark in the rear seat of the Ford Taurus; that Cheyenne's shoulder strap at the time of this collision was being worn behind her back.

The defendant contends that you should find these facts from the evidence, and the plaintiff disagrees that you should do so. Obviously, again, this determination is one of the decisions that you have to make based upon the evidence that has been presented and taking into account all the various rules that I have mentioned to you.

So then finally on this Issue Number 6 on which the defendant has the burden of proof, if you find by the greater weight of the evidence that the enhanced injuries to Cheyenne Stark were proximately caused by an alteration or a modification to the Ford Taurus, made by someone other than Ford Motor Company after it left Ford's control and without Ford's consent or not in accordance with Ford's instructions or specifications, then it would be your duty to answer this issue yes, in favor of the defendant.

On the other hand, if you fail to so find, it would be your duty to answer this issue no, in favor of the plaintiff.

After addressing the jury on the section 99B-3 defense, the trial court finished its instructions and submitted the case to the jury.

After three days of deliberation, the jury returned its verdict, finding Ford not liable for the enhanced injuries to Cody and Cheyenne. Plaintiffs were unable to sustain an unreasonable design claim for Cody's belt, but did so with respect to Cheyenne's. Nonetheless, the jury determined that Cheyenne's enhanced injuries were also proximately caused by a modification of the Taurus, which relieved Ford

of liability. The trial court entered judgment accordingly and taxed $45,717.92 in costs against plaintiffs and the Guardian ad Litem. After unsuccessfully moving for judgment notwithstanding the verdict, a new trial on the modification defense, and a new trial on all issues, plaintiffs and the Guardian ad Litem appealed from the judgment, the order taxing costs, and the order denying their alternative motions.

The Court of Appeals reversed the trial court's judgment, holding among other things that plaintiffs were entitled to a directed verdict on Ford's affirmative defense under section 99B-3. *Stark ex rel. Jacobsen v. Ford Motor Co.*, 204 N.C. App. 1, 12, 15, 693 S.E.2d 253, 260-61 (2010). Disagreeing with the trial court's interpretation, the Court of Appeals reasoned that section 99B-3 gives a manufacturer or seller no defense when the product modifier is not a party to the action at the time of trial. *Id.* at 12, 693 S.E.2d at 260. The court concluded, *inter alia,* that because Gordon Stark was not a party to the action at the time of trial, any modification by him could not support the defense in section 99B-3. *Id.* We allowed defendant's petition for discretionary review. *Stark ex rel. Jacobsen v. Ford Motor Co.*, 365 N.C. 74, 705 S.E.2d 741 (2011).

To resolve this appeal we must decide whether the trial court properly interpreted the scope of the defense provided by section 99B-3 of our General Statutes. Plaintiffs assert that the Court of Appeals correctly stated that section 99B-3 affords a defense only when the product modifier is a party to the action at the time of trial. Defendant, on the other hand, contends the trial court properly interpreted this statute, which allows a manufacturer to be relieved of liability when anyone else alters or modifies its product. Whether a statute has been properly interpreted is a legal question, which this Court reviews de novo. *In re Ernst & Young, LLP*, 363 N.C. 612, 616, 684 S.E.2d 151, 154 (2009) (citations omitted).

We begin our analysis by examining the text of the statute. *Correll v. Div. of Soc. Servs.*, 332 N.C. 141, 144, 418 S.E.2d 232, 235 (1992) (citation omitted). Section 99B-3 states:

(a) No manufacturer or seller of a product shall be held liable in any product liability action where a proximate cause of the personal injury, death, or damage to property was either an alteration or modification of the product by a party other than the manufacturer or seller, which alteration or modification occurred after the product left the control of such manufacturer or such seller unless:

STARK v. FORD MOTOR CO.

[365 N.C. 468 (2012)]

   (1)   The alteration or modification was in accordance with the instructions or specifications of such manufacturer or such seller; or

   (2)   The alteration or modification was made with the express consent of such manufacturer or such seller.

     (b) For the purposes of this section, alteration or modification includes changes in the design, formula, function, or use of the product from that originally designed, tested, or intended by the manufacturer. It includes failure to observe routine care and maintenance, but does not include ordinary wear and tear.

N.C.G.S. § 99B-3 (2011). According to its text, the statute shields a manufacturer or seller from liability proximately resulting from changes to a product's "design, formula, function, or use . . . from that originally designed, tested, or intended" and other unspecified "alteration[s]" and "modification[s]." *Id.* § 99B-3(b). Section 99B-3 does not, however, relieve a manufacturer or seller of liability for all alterations and modifications, only some. *Id.* § 99B-3(a). Whether a manufacturer or seller can avail itself of this statutory defense depends on when and how the modification or alteration occurred and, to a limited extent, on who modified or altered the product. *Id.* A manufacturer or seller cannot escape liability for injury proximately caused by an alteration or modification done before the point in time at which the product left the manufacturer's or seller's control, regardless of who modified the product and how it was done. *Id.* Of those alterations or modifications done after the product leaves the manufacturer's or seller's control, the manufacturer or seller cannot use this defense, no matter who modifies the product, if the alteration or modification was done "in accordance with [the manufacturer's or seller's] instructions or specifications," N.C.G.S. § 99B-3(a)(1), or with its "express consent," *id.* § 99B-3(a)(2). Finally, a manufacturer or seller is not relieved of liability for damage proximately caused by its own modification or alteration; the defense is available only when the modification or alteration "was . . . by a party *other than* the manufacturer or seller." *Id.* § 99B-3(a) (emphasis added).

     Plaintiffs and defendant disagree whether the legislature intended the word "party" in section 99B-3 to have a broad, general meaning or a narrow, technical meaning. The legislature has not defined the word "party" in the statute, *see id.* § 99B-3, or anywhere else in Chapter 99B of our General Statutes, which addresses products liability actions, *see* N.C.G.S. §§ 99B-1 to -11 (2011). Undefined words

STARK v. FORD MOTOR CO.

[365 N.C. 468 (2012)]

are accorded their ordinary meaning, for which we may look to a dictionary. *Perkins v. Ark. Trucking Servs., Inc.*, 351 N.C. 634, 638, 528 S.E.2d 902, 904 (2000) (citations omitted). When not being used in reference to a social event, the noun form of the word "party" is generally defined as a "person" or "group." *Merriam-Webster's Collegiate Dictionary* 848 (10th ed. 1999). The word is used to refer, generally, to an "individual" and can also be used to describe, specifically, an individual or individuals who are involved in a contest, organized for political purposes, or taking part in an activity. *Id.*

The only limiting language in the text of the statute pertaining to the legislature's use of the term "party" is the phrase "other than the manufacturer or seller." N.C.G.S. § 99B-3. That modifying phrase reveals the General Assembly's intent regarding the meaning and scope of the word "party" here. The General Assembly used the term "party" in such a way that it felt it necessary specifically to exclude the manufacturer or seller from the term's broad reach, without regard to whether the manufacturer or seller had been made a party to any litigation by virtue of being sued. Because the status of the manufacturer or seller in regard to a suit is immaterial, this blanket exclusion of the manufacturer or seller from those whose modification or alteration will relieve the manufacturer or seller from liability demonstrates the General Assembly's intent that a "party" under the statute is not limited to a party to the action. In other words, the General Assembly used "party" in such a way that a manufacturer or seller who had not been sued and was not a party to any litigation could nevertheless be a party whose modification or alteration could invoke the defense if the manufacturer or seller had not been specifically excluded. Thus, the limiting language of the statute establishes the intent of the General Assembly that the defense set out in section 99B-3 is available when anyone other than the manufacturer or seller modifies or alters the product.

Moreover, the one who modifies or alters the product becomes a "party" as that word is used in section 99B-3 at the time of the modification, before the commencement of any litigation. The text of section 99B-3 focuses on several distinct points in time. The introductory language of the statute is concerned with the time at which the defense of product modification or alteration is used in litigation: "No manufacturer or seller of a product shall be held liable in any product liability action . . . ." *Id.* § 99B-3(a). The remaining temporal portion of section 99B-3 focuses on the points in time at which the modifica-

**STARK v. FORD MOTOR CO.**

[365 N.C. 468 (2012)]

tion and injury occurred: When "a proximate cause of the personal injury . . . was . . . an alteration or modification . . . by a party other than the manufacturer or seller, which . . . occurred after the product left the control of such manufacturer or such seller." *Id.* The legislature's use of the past tense "was" when referring to the modification by a party illustrates that the one who modifies the product is a "party" as that word is used in section 99B-3 at the time of the modification, before any litigation regarding the subject. This usage, too, indicates that the General Assembly intended that the word "party" have a broad, general meaning, and that the defense found in section 99B-3 be available when anyone other than the seller or manufacturer modifies or alters the product. Accordingly, we conclude that the trial court's interpretation is consistent with the statute's text.

The trial court's interpretation of section 99B-3 comports with the long-standing explanation of this statute found in our Pattern Jury Instructions. There are two Pattern Jury Instructions that address section 99B-3: Civil 744.07 and Civil 743.07. The former applies to causes of action arising on or after 1 January 1996, and it was drafted following the only amendment to the statute in its history. *See* Act of July 29, 1995, ch. 522, sec. 1, 1995 N.C. Sess. Laws 1872, 1873-74. The instruction states in relevant part that this defense applies when "someone other than the defendant made the alteration or modification." 1 N.C.P.I.—Civ. 744.07 (gen. civ. vol. May 1999) ("Products Liability—Seller's and Manufacturer's Defense of Product Alteration or Modification. N.C.G.S. § 99B-3(a)."). The latter instruction applies to pre-1996 causes of action, and it similarly interprets the defense found in section 99B-3 to be available when "someone other than the defendant made the alteration or modification." 1 N.C.P.I.—Civ. 743.07 (gen. civ. vol. May 1999) ("Products Liability—Seller's and Manufacturer's Defense of Product Alteration or Modification. N.C.G.S. § 99B-3(a)."). The North Carolina Pattern Jury Instructions are prepared by a committee of ten trial judges appointed by the President of the Conference of Superior Court Judges of North Carolina, 1 N.C.P.I.—Civ. .005 (gen. civ. vol. June 2010), and those instructions are designed to articulate the law plainly and accurately, 1 N.C.P.I.—Civ. .010 (June 1975). While the Pattern Jury Instructions are not binding on this Court, *State v. Ward*, 364 N.C. 157, 161, 694 S.E.2d 729, 732 (2010), they do express the long-standing, published understanding of this statute, with which the trial court's explanation in this case—the section 99B-3 defense applies when "someone other than the defendant made the alteration or modification"—is consistent.

STARK v. FORD MOTOR CO.

[365 N.C. 468 (2012)]

The trial court's interpretation of section 99B-3 is also consistent with scholarly commentary. Shortly after the statute's enactment, a law review article written by two distinguished members of the bar observed that under section 99B-3, "an alteration or modification by someone other than the manufacturer or seller relieves both parties of liability if (1) the modification or alteration was not done according to instructions or specifications or (2) the modification or alteration was not done with the express consent of the manufacturer or seller." Charles F. Blanchard & Doug B. Abrams, *North Carolina's New Products Liability Act: A Critical Analysis*, 16 Wake Forest L. Rev. 171, 175 (1980). More recent commentary is consistent with that initial observation. *E.g.*, John N. Hutson, Jr. & Scott A. Miskimon, *North Carolina Contract Law* § 16-3-1, at 775 (2001) ("The Products Liability Act provides a defense to product liability actions where a proximate cause of the injury was an alteration or modification of the product by someone other than the manufacturer or seller."). It is worth noting that during these years of consistent commentary and interpretation, the General Assembly has revisited section 99B-3 only once, in 1995, making just a superficial, nonsubstantive change by adding a serial comma after the word "death." Ch. 522, sec. 1, 1995 N.C. Sess. Laws at 1873-74.

The Court of Appeals' reading of section 99B-3, on the other hand, is not supported by the text of the statute. That court reasoned that, by using the word "party" in the phrase "party other than the manufacturer or seller," the legislature intended to limit the availability of this defense to cases in which the one who modified or altered the product is a party to the action at the time of trial. *Stark*, 204 N.C. App. at 12, 693 S.E.2d at 260. If the General Assembly had intended to limit the availability of this defense to the circumstances articulated by the Court of Appeals, it could have done so by inserting the words "to the action" into the statute. A cursory review of other sections of our General Statutes reveals the legislature is familiar with the phrase "party to the action." *See, e.g.*, N.C.G.S. § 58-2-75(d) (2011) ("Appeals . . . may be taken to the appellate division of the General Court of Justice by any *party to the action* as in other civil cases." (emphasis added)). Adopting the Court of Appeals' interpretation would force this Court impermissibly to read into section 99B-3 words the legislature chose not to include in its text.

The Court of Appeals' interpretation of section 99B-3 is contrary to that statute's plain language, so we reverse that court's decision. We hold instead that the defense found in section 99B-3 applies not

only when the one who modifies or alters the product is a party to the action concerning the product, but also whenever anyone other than the manufacturer or seller modifies or alters the product and the remaining statutory requirements are met. The Court of Appeals held that Ford could not establish a section 99B-3 defense using Gordon or Tonya Stark as the modifier because they were not parties to the action at the time of trial. *Stark*, 204 N.C. App. at 10-12, 693 S.E.2d at 259-60. Because there is no such legal requirement, to resolve the directed verdict inquiry, we must now consider whether there is sufficient evidence, or some factual basis, to support a determination that someone other than Ford modified the Taurus.

In this undertaking we must be mindful of the posture of this case and the rules regarding directed verdict. In considering a motion for directed verdict, the trial court in this case was required to view the evidence in the light most favorable to Ford and to give Ford all reasonable inferences from the evidence, resolving all evidentiary conflicts in Ford's favor. *See Farmer v. Chaney*, 292 N.C. 451, 452-53, 233 S.E.2d 582, 583-84 (1977) (citations omitted); *see also Taylor v. Walker*, 320 N.C. 729, 733-34, 360 S.E.2d 796, 799 (1987) (citations omitted) (explaining the standard to be used when considering a motion for judgment notwithstanding the verdict, but noting the same standard is applied when ruling on motions for directed verdict). So long as some view of the facts reasonably established by the evidence would support a jury's decision in favor of Ford, the trial court properly denied plaintiffs' motion. *Taylor*, 320 N.C. at 733-34, 360 S.E.2d at 799 (citation omitted). In other words, if there is more than a scintilla of evidence supporting this affirmative defense, the trial court's decision should be affirmed. *See Brinkley v. Nationwide Mut. Ins. Co.*, 271 N.C. 301, 305-06, 156 S.E.2d 225, 228-29 (1967) (citation omitted).

With this deferential standard in mind, we conclude there is sufficient evidence in the record from which the jury could have concluded that Gordon Stark modified the vehicle. He testified that he placed Cheyenne in the Taurus on the morning of the accident. Gordon explained that Cheyenne was asleep when he put her in the vehicle and that he was the one who buckled her seat belt that morning. When Gordon placed Cheyenne in the Taurus, he observed that the seat belt was "way too big" for her and that it fell across her head and neck area. Gordon informed the jury that Cheyenne's shoulder belt was behind her after the collision. Ford's experts opined that the shoulder portion of Cheyenne's seat belt was behind her back during the collision as well. From this evidence the jury could properly

conclude that Gordon Stark, despite his recollection to the contrary, placed the shoulder portion of Cheyenne's seat belt behind her back after buckling her in, perhaps in an attempt to prevent the belt from falling uncomfortably across her head and disturbing her sleep. The trial court's decision on plaintiffs' motion for directed verdict, as well as the jury's verdict and the trial court's judgment applying section 99B-3 to relieve Ford of liability for the injury proximately caused by the design of its product, can therefore be sustained on the basis of this evidence, and we need not consider evidence of other potential modifications or modifiers.

In sum, we reverse the decision of the Court of Appeals that the defense found in section 99B-3 of our General Statutes is available only when the product modifier is a party to the action at the time of trial. The plain language of section 99B-3 says that this defense may be used when anyone other than the manufacturer or seller modifies the product, so long as the remaining requirements of that section are met. There was sufficient evidence presented in this five week trial from which the jury could conclude that Gordon Stark modified the Taurus. Having resolved this case on that issue, we need not consider the remaining issues presented by the parties to this Court, and any discussion of them would be obiter dictum. Accordingly, we express no opinion regarding other aspects of the Court of Appeals decision on the propriety of incorporating child negligence principles into the provisions of Chapter 99B, the party status of Gordon and Tonya Stark at the time of trial, and the validity of conducting a trial in this case solely on the issue of damages. This case is remanded to the Court of Appeals for additional proceedings consistent with this opinion.

REVERSED AND REMANDED.

Justice HUDSON concurring in part and dissenting in part.

I concur with the majority's holding that the use of the word "party" in N.C.G.S. § 99B-3(a) does not limit that defense to alterations or modifications by parties to the lawsuit. Because I disagree with the majority's decision to address additional issues, and particularly the majority's assertion that, from the evidence presented, the jury could properly conclude that Gordon Stark modified the Taurus by placing the seat belt behind Cheyenne, I respectfully dissent from the majority's ultimate holding. I would instead reverse the Court of Appeals' decision on the availability of the section 99B-3 defense without reaching any additional issues, and remand for consideration of those issues.

First and foremost, I believe the majority here improperly engaged in the sufficiency of the evidence analysis found near the end of the opinion. In its opinion the Court of Appeals held that Gordon Stark was not a "party" under section 99B-3; therefore, that court did not analyze the evidence regarding modification by Gordon Stark. The entire discussion of this matter in the Court of Appeals' opinion is as follows:

> Plaintiff next addresses Defendant's argument that Gordon Stark or Tonya Stark modified the seatbelt by improperly placing Cheyenne in the seat with the shoulder belt behind her back. Plaintiffs argue that Cheyenne was still entitled to a directed verdict because neither Gordon Stark nor Tonya Stark was "a party" to the action, as required by N.C. Gen. Stat. § 99B-3.

> N.C.G.S. § 99B-3 provides in pertinent part that:

> No manufacturer or seller of a product shall be held liable in any product liability action where a proximate cause of the personal injury, death, or damage to property was either an alteration or modification of the product by a party other than the manufacturer or seller, which alteration or modification occurred after the product left the control of such manufacturer or such seller. . . .

> N.C.G.S. § 99B-3 (emphasis added).

> Defendant argues that the trial court's judgment, based on the jury's verdict, was supported by evidence that Gordon Stark misused the rear seatbelt by putting Cheyenne in the backseat and buckling her seatbelt with the shoulder belt behind her back. Defending against Plaintiffs' motion for directed verdict, Defendant argued at trial that "[m]ore importantly, what is the specific evidence in this case about who used Cheyenne Stark's belt; Gordon Stark. He put her in that belt on that day. He is the one who affixed her to this vehicle. He's the one who used the product." Plaintiffs argue that N.C.G.S. § 99B-3 is inapplicable to any alleged alterations or modifications performed by either Tonya Stark or Gordon Stark in placing Cheyenne in the seatbelt improperly, because neither Tonya Stark nor Gordon Stark is a party to this action.

> At the time of trial, neither Tonya Stark nor Gordon Stark were parties to the action.

> . . . .

Because Defendant asserts that the modification was performed by Gordon Stark, who is not a party to the action in this case, Defendant is unable to establish an N.C.G.S. § 99B-3 defense as to such an alleged modification.

. . . .

In light of our holding, we need not address Plaintiffs' arguments concerning judgment notwithstanding the verdict, entry of judgment, or motion for a new trial.

*Stark ex rel. Jacobsen v. Ford Motor Co.*, 204 N.C. App. 1, 9-10, 12-13, 693 S.E.2d 253, 258-59, 260-61 (2010).

It is the practice of this Court to reach only those issues passed upon by the Court of Appeals and to remand for consideration of any issues beyond those necessary for our decision. *See, e.g.*, N.C. R. App. P. 16(a) (stating that "[r]eview by the Supreme Court after a determination by the Court of Appeals . . . is to determine whether there is error of law in the decision of the Court of Appeals"); *Va. Elec. & Power Co. v. Tillett*, 316 N.C. 73, 76, 340 S.E.2d 62, 64-65 (1986) ("Giving proper deference to the Court of Appeals, we decline to address the remaining issues raised by the parties but not addressed by that court in its opinion in this case. Instead, we remand the case to the Court of Appeals so that it may address those issues initially on appeal and prior to their being decided by this Court."). In my view, the majority incorrectly identifies our task here: after reversing the Court of Appeals' decision on section 99B-3, the majority states that "to resolve the directed verdict inquiry, we must now consider whether there is sufficient evidence, or some factual basis, to support a determination that someone other than Ford modified the Taurus." Contrary to this assertion, it is not our task to "resolve the directed verdict inquiry," which by its nature requires weighing of evidence and drawing of inferences. Rather, we need only review the decision below for error of law, as required by Rule 16(a). Because the Court of Appeals did not assess in any way the sufficiency of the evidence of Gordon Stark as modifier, that issue is not properly before this Court.

The only error of law shown in the decision below relates to the interpretation of section 99B-3, and the majority here reverses the Court of Appeals' interpretation of the word "party" in that section. It should have done no more than so holding and remanding for the Court of Appeals to consider the evidence. Because I would remand upon deciding that the Court of Appeals misinterpreted section 99B-3, I dissent to the extent that the majority's opinion goes beyond that point.

The Court of Appeals first, and now the majority here, resolve this case only on Issues I and II as presented in plaintiffs' brief to the Court of Appeals. Because of its resolution of Issues I and II, the Court of Appeals did not reach issues III or IV, which argued alternative grounds for relief, or Issue V regarding costs. None of the latter three issues were presented to this Court, and as such, they have not yet been addressed by any court. Accordingly, I would specifically hold that on remand, the Court of Appeals should address these remaining issues.

Our proper role, in my opinion, is to ask the Court of Appeals to review the sufficiency of the evidence whether Gordon Stark modified the Taurus before we undertake that matter. Nonetheless, because the majority decided to engage in that analysis—incorrectly, in my view, holding the evidence sufficient—I include the following discussion of why I conclude the opposite.

It is undisputed that Ford bears the burden of proof on its affirmative defense under N.C.G.S. § 99B-3. "In the case of an affirmative defense . . . a motion for directed verdict is properly granted against the defendant where the defendant fails to present more than a scintilla of evidence in support of each element of his defense." *Snead v. Holloman*, 101 N.C. App. 462, 464, 400 S.E.2d 91, 92 (1991) (citations omitted). On the other hand, we are reviewing the denial of a directed verdict sought by plaintiffs; therefore, "[defendant's] evidence must be taken as true and all the evidence must be considered in the light most favorable to the [defendant], giving him the benefit of every reasonable inference to be drawn therefrom." *Manganello v. Permastone, Inc.*, 291 N.C. 666, 670, 231 S.E.2d 678, 680 (1977) (citations omitted). We also "must ignore that which tends to establish another and different state of facts or which tends to contradict or impeach the testimony presented by [defendant]." *Morgan v. Great Atl. & Pac. Tea Co.*, 266 N.C. 221, 222-23, 145 S.E.2d 877, 879 (1966). "But, when the evidence is so considered, it must do more than raise a suspicion, conjecture, guess, surmise, or speculation as to the pertinent facts in order to justify its submission to the jury." *Jenrette Transp. Co. v. Atl. Fire Ins. Co.*, 236 N.C. 534, 539, 73 S.E.2d 481, 485 (1952) (citing *Denny v. Snow*, 199 N.C. 773, 774, 155 S.E. 874, 874 (1930) (per curiam)).

With these standards in mind, I now examine the evidence. Both sides presented expert testimony on the design of the seat belt and the injuries to the children. Based on their evaluations of the injuries and the condition of the seat belts after the accident, defendant's

STARK v. FORD MOTOR CO.

[365 N.C. 468 (2012)]

experts testified that the shoulder belt must have been behind Cheyenne's back at the time of the accident. Taking this evidence as true, *Manganello*, 291 N.C. at 670, 231 S.E.2d at 680, I must assume that the shoulder belt was, in fact, behind Cheyenne at the time of the accident. Because N.C.G.S. § 99B-3 does not on its face accord any significance to the identity of the party that alters or modifies the product, except that the party be someone "other than the manufacturer or seller," N.C.G.S. § 99B-3(a) (2011), that showing alone would ordinarily survive directed verdict against the section 99B-3 defense. Present here, however, are special circumstances which require us to evaluate precisely how or by whose hand the shoulder belt came to be behind Cheyenne. Specifically, because Cheyenne was only five years old, I conclude, as the Court of Appeals did, that she was incapable as a matter of law of altering or modifying the Taurus within the meaning of the statutory defense. As a result, the defense is only available to Ford if it can show that someone other than Cheyenne modified or altered the Taurus.

While the text of the statute does not generally require that the modifying or altering party be identified, the statute does specifically use the phrase "proximate cause." It is a long-standing rule of construction that "when a statute makes use of a word, the meaning of which was well ascertained at common law, the word will be understood in the sense it was at common law." *Smithdeal v. Wilkerson*, 100 N.C. 66, 67, 100 N.C. 52, 53, 6 S.E. 71, 71 (1888) (citing *Kitchen v. Tyson*, 7 N.C. 232, 233, 7 N.C. [3 Mur.] 314, 315 (1819); *accord Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59, 31 S. Ct. 502, 515 (1911) (stating that "where words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense"). As such, unless otherwise stated, the statute incorporates common law principles associated with proximate cause. *See Ridge Cmty. Investors, Inc. v. Berry*, 293 N.C. 688, 695, 239 S.E.2d 566, 570 (1977) (noting that "[i]n interpreting statutes .... it is always presumed that the Legislature acted with full knowledge of prior and existing law") (citations omitted).

As the Court of Appeals properly discussed, under the common law, "[f]oreseeability of some injurious consequence of one's act is an essential element of proximate cause, though anticipation of the particular consequence is not required." *Hastings ex rel. Pratt v. Seegars Fence Co.*, 128 N.C. App. 166, 170, 493 S.E.2d 782, 785 (1997) (citing *Sutton v. Duke*, 277 N.C. 94, 107, 176 S.E.2d 161, 168-69

(1970)). This Court in *Walston v. Greene* held that a child under seven years of age is incapable of negligence as a matter of law "because a child under 7 years of age lacks the discretion, judgment and mental capacity to discern and appreciate circumstances of danger that threaten its safety." 247 N.C. 693, 696, 102 S.E.2d 124, 126 (1958) (citations omitted). In other words, a child under seven years of age cannot, as a matter of law, determine the foreseeable consequences of her actions in the analysis of proximate cause. The Court of Appeals analyzed this issue properly and concluded that Cheyenne was "unable to 'foresee' that any modification or alteration could be a proximate cause of her injury." *Stark*, 204 N.C. App. at 8, 693 S.E.2d at 258. Even if Cheyenne altered or modified the Taurus by her use of the shoulder belt, her actions cannot, as a matter of law, be considered the proximate cause of her own injury. Therefore, the defense in N.C.G.S. § 99B-3 is only available to Ford if it provides sufficient evidence that someone other than Cheyenne modified or altered the belt.

Addressing that issue, the majority here summarizes some of the evidence and concludes that "[f]rom this evidence the jury could properly conclude that Gordon Stark, despite his recollection to the contrary, placed the shoulder portion of Cheyenne's seat belt behind her back after buckling her in." The problem with this conclusion is that the testimony does not support it.

The evidence shows that Gordon buckled Cheyenne into the seat belt. Gordon testified that she was asleep when he buckled her in. He also testified that the belt was "way too big" for her and fell across her head and neck area.[1] Under the directed verdict review standard, we must ignore the obvious inference from Gordon's testimony that, because the belt was "right under her head/neck area," it had to be in front of her. *See Morgan*, 266 N.C. at 222-23, 145 S.E.2d at 879. We also must ignore Tonya Stark's testimony that she confirmed that the children's seat belts were properly worn before the car moved. *See id.* Last, as discussed earlier, we accept as true evidence from defendant's experts that the belt was behind Cheyenne at the time of the accident.

Thus, we are left with the following "facts" under the directed verdict standard of review: Gordon buckled a sleeping Cheyenne into

---

1. The majority speculates that "perhaps" he moved the belt behind her "in an attempt to prevent the belt from falling uncomfortably across her head and disturbing her sleep." Such pure speculation has no place in the legal analysis here. That the evidence provides a possible reason why Gordon might have wanted to move the belt does not lead to a reasonable inference that he *did* move the belt.

## STARK v. FORD MOTOR CO.

[365 N.C. 468 (2012)]

her seat and noticed that the belt was "way too big" for her; roughly five or ten minutes later[2] the belt was behind her at the moment of the accident. Based on careful review of the transcripts, I conclude there is no testimony or other evidence whatsoever as to what, if anything, happened to the shoulder belt in the intervening time period. In light of this lack of evidence, then, there are at least three possible scenarios consistent with the evidence: 1) Gordon put the belt behind Cheyenne; 2) Cheyenne moved the belt behind her, either voluntarily after waking up or involuntarily while sleeping in the moving car; or 3) Cheyenne slipped out from under the belt while sleeping because it was too big. There is absolutely no evidence on which a jury could choose among these three options. "A resort to a choice of possibilities is guesswork." *Powell v. Cross*, 263 N.C. 764, 768, 140 S.E.2d 393, 397 (1965) (citations omitted).[3]

Thus, even "when the evidence shown in the record of [a] case on appeal is taken in the light most favorable to [defendants], and giving to them the benefit of every reasonable inference therefrom, the case . . . is left in a state of uncertainty and rests upon possibility." *Wall v. Trogdon*, 249 N.C. 747, 752, 107 S.E.2d 757, 761 (1959). "A verdict or finding in favor of one having the burden of proof will not be upheld if the evidence upon which it rests raises no more than mere conjecture, guess, surmise, or speculation." *Jenrette Transp. Co.*, 236 N.C. at 539-40, 73 S.E.2d at 485. The evidence as presented by defendant raises no more than "a suspicion, conjecture, guess, surmise, or speculation" that Gordon Stark modified or altered the seat belt. *Id.* Because defendant Ford bore the burden of proving the affirmative defense, I conclude it failed to carry that burden, even with the inherent advantages of the directed verdict standard of review.

I concur that the Court of Appeals erred in its interpretation of the use of the word "party" in N.C.G.S. § 99B-3. I would remand for

---

2. As to the time elapsed between Gordon buckling Cheyenne into the seat and the moment of the accident, we only have testimony that the trip from the house to the store was "three to five minutes" and that Gordon had gone into the store and come back out. We can reasonably infer that the accident occurred approximately five or ten minutes after Gordon buckled Cheyenne in.

3. The Court in *Powell* further stated that "[t]he sufficiency of the evidence in law to go to the jury does not depend upon the doctrine of chances. However confidently one in his own affairs may base his judgment on mere probability as to a proposition of fact and as a basis for the judgment of the court, he must adduce evidence of other than a majority of chances that the fact to be proved does exist. It must be more than sufficient for mere guess and must be such as tends to actual proof." 263 N.C. at 768, 140 S.E.2d at 397 (citations omitted).

that court to consider all remaining issues, including the sufficiency of the evidence that Gordon Stark modified the Taurus. Nevertheless, because the majority improperly reaches that question, and because the evidence fails to establish the section 99B-3 defense as to Gordon Stark as modifier, I respectfully dissent.

Justice TIMMONS-GOODSON joins in this opinion concurring in part and dissenting in part.